which is Unite the Parks as appellants versus United States Forest Service. Looks like we've got a cast of thousands on this argument so again I'll repeat though you might have already heard it that we do appreciate that each of you has braved the pandemic to give us a remote argument when the panel needs your advocacy in cases of this complexity and importance. So I'll thank you in advance on behalf of myself and judges Bennett and Judge Nelson we can proceed with this case. The argument is set for 20 minutes per side and for the appellants we've got three appellant counsel I think Mr. Meyer and Sidaj Frederick or Sidney rather yes Mr. Frederick your honor thank you Mr. Frederick and Mr. Mr. Voss so my eyes have yes your honor my eyes have done a little worse at reading names on the docket so I apologize if I mispronounced anyone's name but for the appellee side of the case for the Forest Service we have well this says Rebecca Jaffe is that better is that correct Rebecca Jaffe yes your honor thank you okay okay now Ms. Fitzgerald oh no I'm sorry is there any counsel here who I've left out no that is it okay so why don't we proceed with argument for Mr. Meyer first it's set for eight minutes and if you can let us know whether you plan to make a rebuttal argument and what you'd like to reserve good morning your honors may it please the court my name is Christopher Meyer and along with my co-counsel Sidney Frederick and Renee Voss I represent the appellant in this matter I will argue why the biological opinion at issue in this case failed to comport with the ESA while Ms. Frederick will handle our NEPA claims excuse me Ms. Frederick and I will each take eight minutes and that will of course be 16 minutes and we will set aside the remaining four of our 24 rebuttal your honors this case involves a programmatic biological opinion authorizing a series of logging projects in the habitat of an endangered species the Pacific Fisher now the Wildlife Service issued this programmatic opinion even though the service does not know how many fishers remain and even though the proposed projects will cause considerable short-term harm to the species the lower court's conclusion that this opinion comported with the Endangered Species Act and that a preliminary injunction was therefore inappropriate is fought for two reasons first the opinion violates the Wildlife Service's obligation to evaluate the current status of an endangered species before issuing a no jeopardy determination and second the opinion fails to consider recent science undercutting its assertion that the proposed projects will in the long term improve the health of the forest and therefore improve long-term outcomes for the species itself now on the current status question your honors we believe there are three central facts that resolve this case the first is that the Wildlife Service does not know the current status of the fisher as the government notes on page 21 of its brief the most recent estimate of fisher population extrapolates extrapolates excuse me for measurements of fisher habitat from before 2010 effectively that study looks at the extant amount counsel can i ask you about that because if that's all the data that it currently if that's the current estimate of the population that it still has uh we've been very clear that best science does not require them to do additional studies now your argument seems to be that they had new estimates where is that new estimate that they overlooked so the new estimate that they overlooked your honor is data that was collected by the forest service after uh the forest service data effectively was was a remotely sensed survey of the extant vegetation the extant habitat uh the same data that that pre-2010 data essentially was so i wanted to provide can i take you to er 1853 this is the um uh i think this is the yeah the the bias buy-off um and it says this uh it says uh although the earlier fisher habitat models were based entirely on vegetation data collected in 2012 or earlier and do not uh and do not accurately portray current post-drought habitat conditions the 2020 interim models have been updated to include some post data and are the best available at this time until additional post drought fisher and vegetation data is available that suggests that it that it was more than just the vegetation data that's going into these models that there's some post drought data that um that was not part of the 2012 model are you contending that the that the fish and wildlife service had both updated vegetation data as well as post drought data your honor our primary submission here is that that uh the 2020 vegetation data by not using that data and rolling it into the existing population models the fish and wildlife service by definition did not use the an agency cannot ignore available biological information well hold on a second i want to back up you said they didn't use the best available data that's not the legal standard the legal standard is the best available science so i i mean if they had this vegetation data and their response seemed to be this is not just a plug and play where you just enter the vegetation data and it shoots out a population number in fact if i if i correct me if i'm wrong but the 2012 estimate for population uh for the fishers was between 100 and 500 like that's a pretty broad range it's not like they were plugging this in and getting some data number that was hey there's 353 so what what do you think the baseline was going to show if they i mean first of all what had to be done and then what was it going to show to the baseline to give more accurate information than the 2012 uh population data so i think there's a few questions there your honor so if i may i'll try to address each of them as we read the esa and its implementing regulations the language that the regulations use is indeed the best available scientific or commercial data and so we don't accept the wildlife services contention that because the data was not yet modeled or translated into some sort of legible form that the wildlife service was effectively authorized to ignore it and we believe that that is justified by the fact that if that were indeed the rule then it would create a perverse incentive for agencies to never incorporate raw data into existing models and leave those models perpetually outdated but to your honor's other point about about the range question what we would submit is that even if the initial estimates were a range and we believe the median number that the government admits in its brief is most likely is all of those numbers are still based on a survey of vegetation from before 2010 and the problem with that is that as we know from uh data collected from before and after the wildfires in 2020 55 of that habitat has been altered in some way either by wildfire or by drought so what what if the record showed and and i'm going to be asking council for the government what the record does but if the record hypothetically showed that for this remotely sensed vegetation habitat data layer that it would have taken three years and with with all deliberate speed to translate that data into a new population scientific estimate would your position be that they can't do anything for that three years even if the district court correctly found that three years is reasonable because this isn't plug and play so again a few notes on that your honor and again i appreciate as you stated in the premise of your question we don't think that that's clear from the record and in fact as the government notes in footnote two of their brief uh the wildlife service is not required to create any new models and or really gather any new data at all but to address the crux of your question um our argument in that situation would be that the wildlife service would have to wait those three years and the reason for this is that the current status analysis and the best available data analysis are not necessarily the same thing the government could very well have the best available data but that data may not provide an accurate representation of the fisher's current status so even even if even if waiting three years even if the government determined that they couldn't wait because whatever the population was waiting would harm the fisher they'd still in your view they'd still have to wait in our view the government would still have to wait precisely because it would not know the current status of the fisher even even if that would wipe out the fisher they'd still have to wait because that's what the law required even if that were ultimately extremely harmful to the fisher well your honor we don't think that on the record here that sort of delay would be harmful to the fisher precisely because as the biological opinion makes clear in the short term these actions are far more likely to harm the fisher than they are to help it all of the government's proposed benefits are on a much larger time frame for example the government claims that fire resilience benefits from these projects will help the fisher over the course of the next 30 years but in the short term not pursuing these projects is probably in the best interest of the fisher rather than pursuing isn't that exactly what they should be able to weigh is what the short term and the long-term benefits are going to be i mean that we see these cases all the time that come up there's this you know they're trying to prevent future fires and they're trying to take actions to remedy that and i think there's agreement that reducing fires will actually benefit the fishers but now we get plaintiffs in here trying to enjoin actions that are actually going to over the long haul reduce fires which are actually going to pose a harm to the fishers that seems like that's exactly what the fish and wildlife service is supposed to be able to consider and balance so two points on that your honor and i see that i'm running out of time so if the panel has further questions i'm of course happy to answer if not i do want to defer to miss frederick on the nipa claims but two points on that the first is that the assumption that in the long term these uh proposed projects will lead to improved fire resilience and this is i believe the crux of our second esa claim uh the wildlife service has not actually engaged with science that does content that does suggest that that might not actually be the case so we would i suppose object to the premise of the question which is that the wildlife service has reached this determination about long-term effects in a reasonable way but more importantly and this goes to the current status question we would contest that a predicate of engaging in that sort of weighing analysis is knowing the current status of the fisher and knowing how many species currently exist which the wildlife service has admitted and the government admits in its briefing that the government simply does not know and so in order to engage in that weighing analysis in a meaningful way to determine for example how many fisher will recover how many fisher will remain how many fisher the government can acceptably take in order to get those long-term benefits the government needs to meet that threshold step of knowing how many fishers there are and by their own admission they simply do not know that and as a result the any analyses that stem from a faulty baseline that is a shaky foundation of a weak current status analysis must be viewed with skepticism um i do see that i've intruded on my on my colleague's time unless the court has any further questions i'd like to defer to miss frederick to discuss the nipa claims thank you very much oh i have one question oh please my question is did litigation relating to the esa how common is it for habitat data like vegetation to be used as a proxy for determining the number of a species that exists i can't speak to the commonality in the run of esa cases your honor but what i can say is that using this sort of data to conduct effectively a carrying capacity estimate of a species population is not an uncommon method at all for the wildlife service or other government agencies to use and the reason for this is that a more rigorous analysis for example a population viability analysis is often a far more involved process and can be very difficult particularly in the case of the species like the fisher which is known for being quite furtive and sneaky and is therefore very difficult to count in a more robust way so these sorts of methods are useful proxies for determining the overall scope of the species population okay thank you mr meyer thank you i think we should turn to miss frederick good afternoon your honors this is sydney frederick on behalf of the appellants the forest service needs to analyze the cumulative effects of its 31 projects in light of recent significant events and until they do so nipa requires that these projects be enjoined our nipa claim begins with the regulation directing agencies to conduct supplemental environmental review when there are significant new circumstances relevant to environmental concerns and bearing on a proposed action or its impacts that circumstances have changed on these forests is not really what's in dispute here the forest service has acknowledged the need to take a second look at its projects environmental impact after recent events recognizing that all 31 of the challenged projects are ongoing discretionary actions that are still subject to nipa supplementation requirements the forest services can i ask one question because i was trying to put the nipa claims into context and it seems to me there's a like a fundamental um disagreement about what nipa requires uh the government seems to claim that you have to challenge an individual nipa document for a specific action and that you haven't done that here you've just said we're have you pointed to the last have you pointed to specific nipa documents for specific projects and challenged those as insufficient under nipa we have not done that here your honor we haven't highlighted any one particular project document but in this case that's because they all share one common problem here which is that none includes accumulative impacts analysis that evaluates all these projects impact after the fisher's listing and the fires okay the forest service's core failure here as i've alluded to just now is that it's declined to supplement the nipa documentation for these projects with an analysis of these projects cumulative effects ninth circuit case law makes clear that when agencies prepare nipa analyses they have to evaluate cumulative impacts these are the impacts that multiple projects could together have on an effective natural resource and the case law also makes clear that agencies are obligated to analyze potential effects to natural resources at the spatial scales that are necessary to understand and protect those resources now in this case all 31 of the challenged projects have the potential to affect one common natural resource that's remaining habitat suitable for fishers on the southern sierra nevada the environmental impact statements done for the 2004 sierra nevada forest plan amendment framework and the fisher conservation strategy that the forest service relies on in designing its projects both recognize this remaining habitat as a natural resource that needs to be managed on a landscape scale and yet the forest service can i ask a question about so your your challenge to nipa it dovetails off of the fisher population or there are other allegations about environmental impacts that were not considered our argument here does not necessarily dovetail exactly with the esa claims we're bringing our argument is that you know after these fires and the fishers listing we have a core question here which is whether completing all these projects is going to allow us to maintain a sufficient amount of habitat for the fisher on this landscape and that accumulative impacts analysis is going to be a core aspect of how the forest service answers that question but that it has neglected to do so here so um and correct me if i'm wrong i thought critical habitat had not been designated for this population of the fisher am i wrong is that correct that is correct your honor what has been established is a set of core habitat patches and linkage areas connecting them the fisher conservation strategy designated prior to the fisher's listing and a baseline assumption if you will of where there is sufficient habitat for the fisher considering that it requires multiple dispersed patches of habitat for an example of a place where you can see that kind of conservation strategy laid out where you can see all the different areas where the fisher was estimated to live in the fisher conservation strategy you can see a map of those core and linkage areas at volume four of the experts of record from pages 691 to 93 and so is it possible for the government to do an appropriate cumulative impact analysis without having an up-to-date viable scientifically based estimate of the current population we would argue your honor that that's an important part of making sure that accumulative impacts analysis here is as informative as it possibly can be but is it your view that they could still do one even on the state of the record without that information that could they do one that would satisfy the law we do think that the agency could do a cumulative effects analysis that would be meaningful to some extent but to be clear we do think and as my co-counsel has argued that just doing a proper cumulative effects analysis requires starting with an assessment of a fisher's baseline status well it does for the endangered species act but NEPA doesn't have that requirement does it well your honor the lands council case that lands council versus powell case that we said in our brief at page 1031 discusses the fact that without some sense of a baseline status for a that was the basis on which the court argued that the cumulative effects analysis in that case was insufficient so there is some NEPA case law suggesting that starting with a baseline assessment of the species is an important part of doing a cumulative effects analysis can i i wanted to point you to er 1888 and and you're probably familiar with even if you're not with the specific document with the numbers but it said that um if we assume all fisher habitat that was lost or no longer available for fisher the overall percentage of fisher habitat subject to forest service activities each year would increase from about one percent to about 1.2 percent that suggests that it's a very marginal increase i mean 98.8 percent of fisher habitat isn't even going to be touched by forest service activities doesn't that help satisfy the fish and wildlife service any NEPA obligation that it has to say that they're just not there's just such a low impact on the habitat that there can't be no cumulative effect could could create the kind of impact that you're suggesting well two responses to that your honor first just briefly we would point you to pages 50 to 51 of our opening brief for a specific discussion of how we would respond to that particular contention on the part of the forest service but the to summarize our response to that argument the you know over half of the fisher's habitat as my co-counsel argued has been altered by the combined effect of drought and fire since the 2011 population estimate and we know from the fisher listing decision that you know it's cumulative impacts of the fish are not any one action or problem that is its you know core threat here and so any project that the forest service carries out first of all these are going to be projects that are carried out over the course of multiple years so that's you know if a project takes about 10 years to complete it could end up having an additional 20 of a negative it could end up altering an additional 20 of the fisher's habitat by the time it's done when you take into account all these effects that are having a that is where the harm to the fisher comes from here and so any argument that any individual one of these projects will have a de minimis effect on the fisher's habitat it fails to consider that aspect of the problem and i see that i'm over my time if there are no further questions i would like to make sure that we ensure a sufficient amount of time for rebuttal on both arguments any questions now all right no judge go okay judge nelson no thank you that's fine mr frederick i guess we'll uh turn to mr voss who's sort of adding cleanup for the appellants um your honor i um wanted to reserve um my time for rebuttal um four minutes okay then that's fine then i think we'll turn to miss chaffey and uh i'm gonna let the appellants have the time they plan for rebuttal so miss chaffey if you need a few more minutes you can just ask me and you'll get it please proceed thank you may it please the court rebecca jesse appearing on behalf of the united states first the fish and wildlife service and the forest service properly evaluated the current status and environmental baseline of the fisher the agency's considered all relevant existing data including the older population estimates that have been referenced in addition population occupancy and monitoring data up through 2019 population trend data up through 2015 population trend studies up through 2018 and on the ground field visits up through 2020 a census population count where you count each individual member of the species is not required to determine the the current status and environmental baseline under the endangered species act and two dc circuit cases have held this specifically the first is can i can i i i'm i'm i am interested in all this but the the main contention here seems to be that there was vegetation data that could have been used could you explain i think the panel would benefit from an explanation of what actually had to be done here because it's not precisely explained in the declaration of uh i forget the expert's name but um but could you walk us through what actually has to be done is it plug and play or is there more that has to happen in the modeling to use vegetation data to get a population estimate yes your honor uh it is absolutely not plug and play and there is a lot more that needs to happen uh in a couple different arenas first there's the type of data that you have so the data that that plaintiffs are referencing the 2020 ravage data which is the post-fire data that's um it's it's a rough data set that the forest service develops quickly after a fire to to get a sense of which what's the severity with which areas burned what have was it a high severity burn here it's not granular data and in fact when often when the forest service goes back a year later to do the same assessment of what areas burned at high we thought everything was dead so it's it's a that's all i want you to be able to continue to answer judge nelson's question but my question is i'd like you to not just answer judge nelson's question but tell me where all this is in the record because uh i've read mr kipers or dr kipers declaration talking about the data uh i've tried to read as much of the record as i could i've read your sites i've read the discussion about dr sawyer if she is dr sawyer and the references to where this is but i can't find anything in the record that talks about what it would actually take to translate the remotely sensed vegetation habitat data into um an updated population estimate and i might have missed it but i'd like you in answering judge nelson's question as to what it would take to also tell us we're in the record that is it is not in the record so how how can how can that how can how can we uphold the the position of the forest service that um we didn't have the best available science when at least as the way i read dr kipers um declaration it's possible to read that as saying all we do have to do is plug and play i i the government's argument is this isn't the best available science because there's so much that has to be done and yet the government chose not to put in the record exactly what had to be done so my i have a couple responses to this your honor my first point is that uh the district court noted in its opinion at 1 er 21 that plaintiffs claims evolved during the course of the briefing and originally plaintiff's argument was you don't have an updated population estimate and that was the focus of the government in its declarations in the reply and an argument at the primary injunction argument and now on appeal plaintiffs are saying um well you had the data and you could have done it so the the the evolution of the case so i would point the court to 1 er 21 where the district court said plaintiffs claims have evolved over the course of this well well i understand what the district court said and i understand what the plaintiffs arguments were but you chose it by the way do i have it right is it dr kiper yes yes okay all right so uh you chose to put in dr kiper's declaration and i'm looking at the page everybody cites to er 619 we use the population estimates the prior ones using spencer's method um uh it wasn't available at the time of our listing rule and our 2020 pbo uh it was available for the 2021 pbo and people including dr um well and people are using it and you told the district court one of people i guess was dr sawyer so you have those facts in there and you chose not to explain to the court how you got from from a to b and if the answer had been it takes it's really easy to get from a to b and if we had wanted to we could have plugged it in and told you that the fisher population is 300 um why isn't it the government's problem not the plaintiff's problem that the government chose not to put that in dr kiper's um deck because surely he knew what it would have taken right first of all i would actually say that i don't know that that that mr kiper would have known that information because the he's actually not one of the people doing the models um but in of showing the likelihood of success on the merits and they need to point to studies that the fish and wildlife service ignored they can't make arguments and and then prevail on an abuse of discretion standard on appeal on the basis of one sentence in a declaration and say well look this this sentence suggests that there's information that the forest service and the fish and wildlife service could have used but didn't the the fact of the matter is that it's plug and play data the conservation biology institute was working but where do we where do we go to find that is it in the in the uh the seat the conservation you were going to the conservation biology institute do they say it's not plug and play that is not in the record your honor and to you mean there's nothing in the record that says it's not plug and play there's nothing in the record that says it's not plug in the play but the standard isn't that the united states needs to explain in every instance why plaintiff's assertions about what is possible isn't possible and you know you know you know i'm sorry i'm sorry but i just wanted to say miss jeff i want you to answer fully judge beddard's question and judge nelson's question but i wanted you to know that when you're done with that i'd like to interject a question of my own absolutely your honor it's it's the explanation of why it's not plug and play isn't in the record and the best i can say at this time is that if that's something the court wants we can provide that uh by a 28 j letter but at the end of the day what constitutes the best scientific and commercial data available is itself a scientific determination and warrants substantial deficits and the ninth circuit held that as recently as 2020 in national uh farm coalition 966 f 583 and we are on an abusive discretion standard here um the there's one sentence in the kuiper declaration that says the conservation biology institute is working with raw habitat data layers and and and it was to update a fisher reproductive habitat model and that data though could not be plugged into the population estimate models that were used in 2011 because those models use different habitat parameters they looked at fisher habitat generally what should the plaintiffs have done well i i judge gold you had a question why don't you go my question is related but a little different so let me pose it now um i thought the supreme court in its state farm decision said that one reason why an agency decision can be arbitrary and capricious is if the agency ignored or did not address an important part of the problem before it if i'm right in that my question is in a case where the agency's prior data was from 2012 and there's now new data from 2020 why isn't the agency ignoring an important part of the problem if they don't address either use the new data or address why it's impractical to do that two points in response your honor the first is that the agency relied on a host of data that was much more recent than 2012 it used population occupancy and monitoring data up through 2019 population where's where's that in the record for those dates i would direct the court to the um the the response oh yes to the to the um revised programmatic biological opinion which starts at 8 er 1843 and also to the united states' response to plaintiffs first and second notices of intense intent to sue under the agents under the endangered species act and that's at 2 er 36 and that leads into my second response to judge gold which is there's also vermont yankee which says that plaintiffs can't save their objections and bring them up at litigation for the first time in their notice of intent to sue plaintiffs weren't saying there's data that you could be using to do more that came up in litigation frankly after the united states had even filed the declarations and so the united states didn't have an opportunity because that wasn't an argument presented to it but the response to the first and second notices of intent to sue which is at 2 er 36 responds to the arguments that plaintiffs are making in in all in other respects including that the united states needed to have a an updated census population count and the the response explains that we're using different types of data population occupancy and monitoring data trend data and um judge nelson this was about 10 minutes back but you you mentioned that you would like those cases from the dc circuit which which specifically say that you don't need to have a census population count and that's well i i think i think we agree i don't know i don't want to speak for everyone else but i think i think we agree you don't have to have a census count if it doesn't exist the problem is if you have data by which you can get a census count where where's the fault line and i think that's what the panel is trying to flesh out here um i mean if if the vegetation data from 2020 didn't exist i think this would be an entirely different case i think you'd say the best available science is everything else we use but now you have this 2020 vegetation data and it's confusing as to what should have been done with it legally yes your honor and i apologize that that that um it's confusing um the fact of the matter is is that the 2020 vegetation data was to model fisher reproductive habitat and it couldn't be used to create a census population estimate the models that did that were not focused solely on reproductive habitat so is dr kuiper's declaration incorrect because i i thought he i i i do not believe so your honor he says that the raw habitat data layer was available and fisher experts were using the newly available data to update habitat models and population trends appropriately for use in our analyses um and population trends is irrelevant to population there are different concepts your honor well the other the other thing that i'm looking at counsel when your colleague in the district court ms mcneil was arguing and and at scr68 which you might have actually uh cited where there was a reference to dr kuiper um and there was a statement by your colleague that something that someone said um about the data being available uh might have been an overstatement um and then what your colleague goes on to say is the update isn't being performed by fish and wildlife it's being performed by the conservation biology institute which is a separate entity but sarah sawyer the declarant one of the declarants here is one of those one of those authors and i mean i'm reading i don't remember how long it was but like a 29 a long declaration um from uh cbi study or data and if it is so clear um that it wasn't a plug and play i i just am baffled that the government decided not to provide that information to the district court um especially since it provided a 20 page declaration from one of the individuals who was i guess involved in sc68 a couple points your honor one i do want to go to the the point you made about is population trend data irrelevant to population it's it's certainly not irrelevant but it's a very different type of analysis population trend data uses monitoring data and occupancy data for example the the forest service has over 200 monitoring locations where it catches pictures hundreds of photos um so and it there's a bunch of statistical modeling that the forest service does to say okay the population is stable or the population is increasing or the population is decreasing and that's very different than creating a census population so so i do want to clarify that those are two different concepts um and then to your point about you know shouldn't the government have made it more clear i i apologize for that your honor um i think that there on appeal there are three narrow issues being argued but at the time of the pi and at the at the at the the speedy pace at which pi briefing was happening there were a lot more issues on the table and i don't think that the government realized that there was going to be this focus on this particular question of can you take data that all of these scientists who are working on studying the fisher absolutely understand is not plug and play i don't think there was an understanding that they would need to explain that and have it in the record for the court because they were going to encounter this argument on appeal okay council let me interject a question here um sam give me one of the questions question the question is this and if this if this question is more or less precluded by some prior waiver of the appellants which you sort of urged earlier that they had raised the issue but if if that's the case you know we'll check the law and so be it assuming it's not precluded what i'd like to know trying to cut to the chase as well as i can is if this were to go back to the agency on remand and there was a limited remand for like a focused remand asking the agency to reassess population of of the animal in light of the current the most current vegetation figures how long would it take for the agency to do that so i have a couple points your honor first this is a preliminary injunction appeal only on the likelihood of success on the merits issue and plaintiffs have to establish all the factors and it's an abuse of discretion standard so i would first suggest that the case be remanded to the district court if the court were inclined to rule in kind of favor to consider the remaining factors but in any event response to your question if the question if the if the question was agency we need you to explain why you don't have an updated census population count i think the agency could prepare that very quickly if the question is you need to prepare a new census population count my understanding is that that type of study could take four to five years um the the most recent and and this is not in the record um the most recent study that i have um that the scientists have told me about that did a census population count took five years it was a what what how long would it take just to use the 2020 vegetation data to come up with some updated number i mean i understand you're saying if you want to do something else but we all agree that that's not necessarily required what would it take to use the 2020 vegetation data to come up with some number how long would that take i'm not sure that that's even possible your honor the 2020 vegetation data was used to develop a model that spits out maps and says okay we have reproductive habitat here that meets the criteria we know in terms of the percentage of canopy cover that the denning fishers need in terms of the type of species and it can at least according to dr kuiper it can be used to get population trends uh so what what would that look like that would just say populations increasing populations decreasing or population is stable which is what the the forest service has been finding and the conservation biology institute have been finding in their studies and and that's a very different type of study it's based on very different statistical modeling the census population estimate modeling that was done in 2011 use assumptions about the size of fisher territory and this the the overlap between fisher you know how much one individual's fisher territory interlaps overlaps excuse me with another fisher's territory and that those the forest service has studies since then that indicate that the size of fisher territory may have changed so they don't but they don't have information that they could just plug in about well we we know we have this much habitat and know they have this much territory and we know there's this much overlap now so it's not just what's the quality of the habitat there's other information that would be needed about for example the size of territory and the overlap and a lot of the recent studies have not been focused on fisher habitat generally but have been focused on fisher reproductive habitat as the forest service sees that as most important for an indicator of the health of the species and so council if hypothetically we were to remand this to the district court as opposed to the agency uh for the government to supplement the information including the non-plug-and-play nature that you've talked about uh and this additional information about why this uh this data that directly translate and isn't something that based on current knowledge would change the agency's decision uh i mean no one likes to lose a case but would there be any um burden uh on the agency to do that other than uh the obvious of extra work and nobody likes to lose a case they think ought to win i certainly think that the united states could provide information and declarations to the district court explaining why this data isn't plug and play i would respectfully suggest that uh a limited remand to explain that would not necessarily be a loss for the united states but i would want to be very i would want to say one thing that would be a tremendous burden on having all of these projects enjoined because they are really important for public safety they're important for firefighter access they're important for the long-term health of the fisher and they're important for forest health and so so that would be a burden uh i think it's very important for the forest service to be able to move forward with these projects and and and continue the important work that they're doing to to improve forest health and and mitigate the wildfires i do want to make a quick point that i know plaintiffs have argued that the forest service is is is wrong about that science um and i would specifically point the court to two ar sites that discussed the extensive body of science indicating that fuels reduction improves landscape resilience and reduces high severity fire and that's eight er one eight eight eight and two er two six seven to six nine uh also insofar as plaintiffs suggest that the fish and wildlife service refused to engage with plaintiff scientific studies uh we we would disagree with that characterization um and plaintiffs cite a quote from from um uh response to a memo to file which is at two er 42 the the plaintiff where the the fish and wildlife service walks through studies that the plaintiffs had presented and says we don't think that they're instructive for the following reasons and the the plaintiffs had also said and we don't think that the models the forest service used to predict wildfire effects nationwide are accurate and the forest the fish and wildlife service said you know the scope of the the modeling program that the service uses nationwide is beyond the scope of this consultation about specific course management hey miss jaffe yeah i see you're five minutes or so beyond your allotted time which of course is natural given the difficult questions posed by by all of us to you and i am giving appellants more time so if you want any additional time right now just tell me how much time you think you need and then let's we'll go with that and uh set a limit and you can conclude in your limit so that the appellants can make a rebuttal argument um hey your honor um renee vos for the talents um we'll ask for a couple extra minutes i think we can wrap it up in six minutes um i i just wanted to stress the last point and uh that did we miss something here judge yes was miss jaffe done i didn't i didn't understand right i had asked miss jaffe if she how much time she needed if the court has any further questions about uh the nipa argument i i haven't had an opportunity to address that i do think our briefing discusses that in depth but i have no questions about that but i still have questions about how we could say that that a forest service decision relying on data that's like about a decade old could be the best available science on the subject that that's really all my my question just relates to the abuse of discretion standard and what the supreme court said in state farm as to why why the agency care for reasons explored on our various questions hasn't failed to address an important part of the problem so why don't you take two minutes and answer give your best shot answering that and then we'll go to throw about a large first the endangered species act requires the best science available and the there was no census a population estimate from more recent than 2011 and the agent endangered species act not require the agency to develop one but the agency did rely on a lot more recent data particularly as i've mentioned population occupancy and monitoring data it looks at where the fisher are at the different monitoring stations takes genetic care samples camera photos hundreds of thousands of photos a year so that's data up through 2019 population trend data and studies up through 2018 population trend data up through 2015 population trend studies up through 2018 and then on the ground field visits that are ongoing but for purposes of the amended biological opinion it was up 2020 the end of 2020 and that was the best science available and the agency has a lot of reasons why the data that the plaintiffs point to could not be used to plug and play um and and i i apologize for the fact that that a lot of that explanation is coming from me and not something i can point to in the record but the fact remains that it the endangered species act requires the best science available not the best that folks wish it could be and what constitutes the best scientific and commercial data available is itself a scientific determination that warrants substantial deference and the this court has upheld that most recently in 2020 at 966 f3d at 925 if the court has no further questions i thank you very much for the generous allotment of time today okay thank you miss jeffrey we thank you that the important case we will proceed to rebuttal argument now uh mr voss i know you're making a rebuttal is miss frederick and and mr meyer are they making a rebuttal to uh judge gold um i'm going to refer one of my questions uh on one of the rebuttal questions to uh chris meyer uh but first i want to apologize for my interruption uh judge nelson um oh it's fine this is pandemic days also i was probably not entirely clear in my comments so no worries let's just proceed you're going to argue i just wanted to make one quick point and then i'll refer the esi data question to um to chris um the point is that um if if the court is considering remand we uh also request that it issue an injunction uh pending the remand because logging and the removal of large trees in these projects that would harm the fisher could start as early as may and june depending on the project well the problem with issuing an injunction is i mean even if you're right on this narrow point there's a whole bunch of other factors we'd have to go through that the district court considered and that i mean a lot of those are factual determinations on abuse of discretion so how how how do we get there i mean sure you're honored in part because the the complaint if we rule in your favor on the population data that's the the only issue is a baseline starting point and i understand that that's required by the regulation but that doesn't seem to affect the substance of whether there's actually harm to the fisher overall so that's a lot go ahead yes it's the basis of um the needed relief though because if you know based on the estimates the population is 55 percent lower perhaps greater than reduced more than that that makes a big difference and in the meantime uh the the project has caused significant harm but there we have addressed the winner factors in our briefing how can it cause how can it cause significant harm when the forest service says it's only touching 1.2 percent of the fisher uh uh habitat i i isn't that i mean i guess it it um is compounded um over time and that's not the only project um plus the 2021 fires have not been considered even though we're not arguing that in this um the percentage at this point in time is um actually going to be much greater than that um but we do we did argue the um the winner factors and under um the case law desert citizens against pollution the abyss and and uh the recent case um environmental protection information center carlson oh uh court um can weigh these factors and issue an injunction uh pending the remand i would like to refer the rest of the data questions to uh to chris um so go ahead chris thank you your honor is just a few points on on the esa question as an initial matter as we've stated here and in our briefing uh we want to emphasize that the current status inquiry and the best available data inquiry are not the same inquiry that there could be situations in which the government uses the best available data but that that data still does not provide an accurate representation of the current status uh so that distinction we believe is important and the reason we think it's important is because what the government is doing here is that they are trying to link best available data and current status and claim that as long as they use the best available data their current status analysis is essentially immune from any inquiry but the problem with that is twofold one the service did not use the best available data even if we want to argue on those grounds as we stated the 2020 vegetation data was not used and as this court has i think made clear and it's colloquy with respondent council the agency does not provide a justification for why that data could not be used uh moreover the uh in her her argument respondents council cited to a series of studies uh for example occupancy studies that she described as going up to 2018 that justify the agency's reliance on this pre-2010 data the problem with that your honors is even though those studies are dated 2013 and 2018 for example zelensky and gray study was published in 2018 all of those studies still use pre-2010 data the zelensky and gray study the uh which is about is there anything better i mean the only thing you've pointed us to is the 2020 vegetation data you keep complaining about all these other studies that they're too old but what's better so two points on that your honor one it's certainly not our burden to flag any type of better science to the agency no i i actually think it is your burden because the agency comes in their burden is to use the best available science they've said that this is the best available science it seems like it is your burden to show that there is out there this is not esa is not a nipa claim i get you know nipa claims you can show all these other considerations they didn't make but best available science seems different than that a point i mean that it a plaintiff has to come in and show that there's better available science so what is the better available science certainly your honor so on that front we believe that the best the better available science is the 2020 data that was gathered by the forest service and the we believe that is because as this court noted in blue mountains biodiversity project an agency violates the best available data standard when it uses outdated data in this case the pre-2010 vegetation data even though new data in this case the 2020 vegetation data undercut the reliability of that older data and that's precisely what's happened here as we noted earlier 55 percent of fisher habitat has been altered since before that initial collection of vegetation data in 2010 and excuse me pre-2010 and the agency has provided no justification either in terms of the manner in which that data would be used or the manner in which that data is not representative to justify not using the 2020 data to update its existing models and therefore flies directly in the face of this course holding in burford where it's stated that an agency may not ignore available biological information when projecting the impacts of an agency action and the last point we'd like to make here your honor is that the services claims that the vegetation data was difficult to model does not somehow immunize them from the obligation to use that best available data as i stated earlier in my discussion with you judge nelson we don't believe that anything in the regulation which speaks only to available data necessarily states that that data only counts for purposes of best available data if it's plug and play or if it's able to be modeled in an efficient way but on a more doctrinal front we don't believe that there's any undue burden and analysis that the government proposes that there is under the esa i mean as the court made clear in tvav hill the protection of species is paramount whatever the cost and if the cost of that is asking the agency to invest a little bit more time to model data that is not plug and play we don't believe there's any doctrinal basis for arguing that creates such an undue burden on an agency that it can flout its foundational consultation obligation to determine the current status of a species before it issues a no jeopardy determination um unless the court has any further questions though um i think we're happy to i have no questions for you uh however i'd like to know if my colleagues do i i i don't judge gold but if if you would indulge me for for 30 seconds with uh with a comment and uh i i mean my general comment is to commend all counsel uh on their uh the council uh who who are students uh it it was for me a delight to hear students arguing and to hear students uh who are so well prepared and did such um an excellent job and gives me uh more confidence in the future of the legal profession and i am very appreciative we thank you i agree with that let me say i have two more brief comments though one is that uh i'd like to i'd like to know if we're going to hear from miss frederick any rebuttal on nipa um your honor uh the council from the doj didn't get a lot of opportunity to discuss their response to our nipa argument but there is one more point that i think it could be helpful to stress here which is that we feel that the forest service's current approach to deciding whether there are environmental impacts worth considering here was not a reasonable exercise of its discretion specifically because it limited its analysis whether there are environmental impacts worth considering to the footprint of each individual project and that's an approach that the bark case we cite in our brief specifically calls out as an abuse of discretion from pages 872 to 873 i just wanted to make sure that i highlighted that point thank you miss frederick well uh my second comment relates to the point that mr voss had mentioned requesting that we issue injunctive relief and i heard my colleague judge nelson saying he wasn't sure we have all the data and answers to do that on the other factors so my comment is this although i have no idea what our panel may decide to do after conference my comment is if our panel was were assumed to decide that we were going to remand to the district court for some purpose relating to this action if we did that or if we were going to remand to the agency in either event any party here could seek rehearing which can cause further delay and uh while they're seeking rehearing if mr voss is right that there's like a ongoing risk to safety of the species uh can address it with the you know risks to the forest as the and to further burns that miss jaffe mentioned in either case either whatever we do any party can seek rehearing or if they need an injunction can file an emergency motion with our court seeking injunction and that's dealt with by by uh by the court on either in a motions panel or else it might be referred to us to decide but if there's a motion for injunction declarations with it could cover all of the issues that are pertinent you know i have no further comment i just want to thank all the council again and uh i think everybody's had a chance to speak uh on behalf of their clients all the advocates have done an excellent job i want to second judge bennett's comment that this gives us further faith in our excellent adversary system so without further discussion unless judge bennett or judge nelson wish to add more don't see this case is now submitted and the court deputy should note it as submitted and the parties will hear from us in due course okay many thanks and we'll now adjourn for the day thank you your honors thank you your honors thank you your honors hello this court for this session stands adjourned
judges: GOULD, BENNETT, NELSON